$400



UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| LEAD INTELLIGENCE, INC. d/b/a JORNAYA, Plaintiff, v. ACTIVEPROSPECT, INC. Defendant. | Civil Action Number: 17 1519 JURY TRIAL DEMANDED |

**VERIFIED COMPLAINT**

1. Plaintiff Lead Intelligence, Inc. d/b/a "Jornaya" ("Plaintiff" or "Jornaya") and Defendant ActiveProspect, Inc. ("Defendant" or "ActiveProspect") are competitors offering online service products that—among other services—allow clients to remain compliant with the Telephone Consumer Protection Act, as well as certify consumer intent related to purchased leads.

2. In an effort to gain a competitive advantage, on March 28, 2017, Steve Rafferty, the CEO and Founder of ActiveProspect, Inc., authored a blog post ("Blog Post") on ActiveProspect's website containing false and misleading information about Jornaya and its products. (*See* Blog Post, attached as Exhibit A).

3. Rafferty falsely characterizes Jornaya's services as a "retargeting network"—a network of websites that uses scripts to track an Internet user's browsing history from website to website, report upon that user's browsing and serve advertisements to that browser to redirect the user back to a prior website. Jornaya does not engage in retargeting.

4. Rafferty also falsely suggests that Jornaya sells personal information about consumers to "unrelated companies." Jornaya does not collect or sell personal information about consumers.

5. For these reasons, Jornaya files this Complaint seeking temporary and preliminary injunctive relief, permanent injunctive relief, and money damages to the extent which they may be determined and avers as follows:

## PARTIES

6. Plaintiff Jornaya is a Delaware corporation with a principal place of business at 201 South Maple Street, #150, Ambler, PA 19002.

7. Upon information and belief, Defendant ActiveProspect is a Nevada corporation with a principal place of business at 4203 Guadalupe St, Austin, TX 78751.

## JURISDICTION AND VENUE

8. This Court has jurisdiction over this dispute pursuant to 28 U.S.C. § 1332 as the parties are citizens of different states and the amount in controversy exceeds $150,000, exclusive of interest.

9. This Court has jurisdiction over this dispute under 28 U.S.C. § 1331 (conferring original jurisdiction "of all civil actions arising under the Constitution, laws or treaties of the United States") and 15 U.S.C. § 1121 (conferring original jurisdiction "of all actions arising under this chapter").

10. This Court has personal jurisdiction over Defendant because, among other reasons, it transacts business in this judicial district, maintains and serves clients located in this judicial district, and directly markets its products to clients in this judicial district via its website.

11. Venue is appropriate in this district under 28 U.S.C. § 1391 because a substantial portion of the events or admissions giving rise to the claims occurred in the district, and Defendant is subject to personal jurisdiction in this district.

## FACTS

### I. Jornaya's LeadiD System

12. Jornaya is a technology company that provides non-personal information about customer leads that a marketer has purchased or generated. It utilizes commonly used computer code called JavaScript and patented processes.

13. Websites that generate leads may use Jornaya code on their sites to accomplish two things: (1) issue a unique identifier ("LeadiD") for a consumer's particular website visit, much like a vehicle identification number ("VIN") for a car; and (2) collect anonymous (non-personal) information about that particular website visit, much like Google Analytics or a similar service. Jornaya stores the anonymous information and LeadiDs for the purpose of responding to a future query about a LeadiD, much like a vehicle history query for a car's VIN.

14. The LeadiD system works much like a VIN. Jornaya allows websites that generate and sell leads to include the LeadiD with the leads they sell to other parties. This enables lead buyers to query Jornaya with the LeadiDs they already possess to verify each lead's authenticity and history. The lead buyer can then certify that the leads are what the seller represented them to be, ensure compliance with the established regulatory marketing standards, and better interact with consumers for optimal outcomes.

15. Jornaya's "Intelligence" product helps to facilitate that process. When the Intelligence product is queried with a valid LeadiD, it responds with data points such as how

recently the lead was completed and how engaged the consumer was on the website visited (like Google Analytics).

16. The information that Jornaya possesses is not an open database; instead, data about a particular lead is only accessible upon the request of a party that has a LeadiD associated with the lead.

17. Importantly, a LeadiD corresponds to a site visit, and not a site visitor. If a consumer visits a site on three consecutive days, those visits will generate three distinct LeadiDs, even if it is the same consumer. If that consumer then visits another website using Jornaya's services, that visit will generate a *fourth* LeadiD. Jornaya links its lead data to site visits, not individual identified consumers.

18. Jornaya's Terms of Use and Privacy Policies, publicly available on its website, are very clear in explaining the restrictions it places on the collection, use, and access to data it witnesses when its computer code runs on a website during the generation of a lead.

19. The only way to access data from Jornaya is if its client has agreed to its Terms of Use and already has a LeadiD. Then, and only then, can a company access information about a specific event. This data is always requested from Jornaya by a client—Jornaya does not proactively send data to anyone absent an inquiry with a valid LeadiD.

20. Jornaya does not collect consumer personal information. Any consumer personal information is automatically encrypted as it enters Jornaya's system using a one-way hash function which cannot be reversed, resulting in anonymized values only. Jornaya cannot sell a consumer's phone number or email address, because Jornaya does not collect consumer contact information.

21. In the world of online advertising, some companies use anonymous consumer identifiers to "retarget" advertising to consumer browsers or proactively share consumer information. As commonly known in the online advertising industry, retargeting networks use scripts to continuously track an Internet user's browsing history from website to website, proactively report upon that user's browsing, and serve advertisements on subsequent websites to attempt to redirect the user back to a prior website.

22. Jornaya does not do this. It is not in the online advertising business and does not sell products to consumers. It collects no personal consumer data, does not follow consumers continuously as they journey across multiple websites, and accordingly is not in the business of selling or continuously tracking personal consumer information.

23. Furthermore, a retargeting network must push data to advertising networks or other databases for targeting purposes. This would be impossible in the LeadiD system because Jornaya's data is only accessible via a query from a party that already has the lead information and a valid LeadiD.

## II. ActiveProspect and Its Blog Post

24. ActiveProspect is a software company that offers two core products: LeadConduit, a sales lead management platform, and TrustedForm. TrustedForm directly competes with two of Jornaya's products: Jornaya Intelligence and Jornaya TCPA Guardian.

25. Like Jornaya's products, TrustedForm is a JavaScript-based service that offers independent third party lead certification services to verify the origin and authenticity of Internet leads. TrustedForm verifies the origin and authenticity of Internet leads by capturing information including the timestamp, IP address, browser, source URL, and a real-time screenshot of the web form as seen by the site visitor.

26. Like Jornaya, TrustedForm witnesses the moment of lead capture and provides a Certificate ID, similar to Jornaya issuing a LeadiD.

27. Like Jornaya, TrustedForm provides contextual data about the lead.

28. Like Jornaya, TrustedForm offers to verify that a firm is receiving authentic leads, as well as verify and document consent for regulatory compliance.

29. The parties' competing products launched at similar times, target the same industries and firms, and use similar language and promotion in the marketplace.

30. On March 28, 2017, Steve Rafferty, the CEO and Founder of ActiveProspect, authored an advertising Blog Post on ActiveProspect's public website containing false and misleading information about Jornaya and its products.

31. The blog accuses Jornaya of engaging in retargeting, a practice shunned by Jornaya's and Active Prospect's website publisher customers, in an attempt to lure Jornaya's customers to ActiveProspect. It further portrays Jornaya as an unethical company, operating to the detriment of the economic interests of its customers.

32. The harmful misrepresentations in the Blog Post begin in the title: "Jornaya Using Script as a Retargeting Network." A retargeting network is an advertising network that continuously tracks consumers from website to website and serves subsequent advertisements to redirect consumers back to the web pages that they had previously visited. Jornaya is not a retargeting network. Jornaya's scripts do not track a website visitor's browsing from website to website and report back information about every website the consumer visited after the first. Jornaya's scripts do not enable a first website to cause advertisements to be served to a visitor at subsequently visited websites. Jornaya does not market its products as retargeting services, and Jornaya expressly states in its Terms of Use that it does not engage in retargeting consumers.

*See Jornaya Terms of Use* (Nov. 4, 2016), http://www.jornaya.com/terms-of-use ("In no way does Jornaya retarget consumers or sell consumer data of any kind.").

33. ActiveProspect misleadingly suggests that Jornaya is "building a massive consumer database" by "web-stalking" consumers, and suggests that Jornaya sells personal information about consumers to "unrelated companies." This suggestion is false. Jornaya does not collect or store personal information about consumers, does not monitor consumers across their entire "web journey," and does not sell or otherwise provide personal consumer information.

34. The Blog Post consistently misrepresents that Jornaya is a retargeting network which collects and resells individual consumer data. For example, the Blog Post states that:

a. Jornaya "collects data and monitors visitor activity that Jornaya resells in the form of data products like . . . retargeting triggers. This has serious implications for your business, so you should be informed of what is going on." Jornaya does not retarget consumers, facilitate retargeting, continuously track consumers' personal web browsing, keep or distribute consumer personal data, keep or distribute consumer phone numbers, or share data with anyone who does not already possess the LeadiD. There is no other way to get data from Jornaya.

b. "[I]f a consumer who requests to be contacted by a lender in January visits a different mortgage site in March, Jornaya will notify the initial lender that she's interested again, even though she didn't revisit their site. The initial lender will start calling her again, even though she didn't ask them to." Jornaya does not continuously track consumers' personal web browsing, does not keep or distribute

consumer personal data, does not keep or distribute consumer phone numbers, and does not send notifications or data to its customers absent a query.

c. "By visiting the site, the script on the site notifies Lender X that the consumer is shopping for a mortgage again. So Lender X starts calling the consumer again, even though they did not receive the lead from Site B. If the consumer submits the form at site B, they will be contacted by the Site B lenders, plus Lender X." Jornaya does not notify prior companies of any subsequent lead activity absent a query with a valid LeadiD and does not collect or distribute consumer personal information.

d. "How many companies might call me? Do they put a cap on the number of retargeting clients they will notify about my behavior online? Could I get a call from an additional three or four companies by visiting a site? Ten companies? How long do they track me? It is not clear, as it isn't disclosed anywhere. As a consumer, can I opt out from this practice? There are plenty of privacy questions that are simply not answered." Jornaya does not continuously track consumers' personal web browsing, does not keep or distribute consumer personal data, does not share any leads with any company that does not already have the lead from another source, and does not keep or distribute consumer phone numbers.

e. "Jornaya is monetizing the site visitors while providing no compensation to the site owner in return. If the site sells shared leads to four buyers, this is like having a fifth buyer that doesn't pay anything for the lead. There is no scenario where this is good for the site owner." Jornaya's product does not "monetize" a site's visitors at the expense of a site owner, and Jornaya does not act as an extra lead

buyer. Further, there is no way for a "fifth buyer" to gain access to lead information from Jornaya because Jornaya does not provide leads to its customers. Jornaya's services do not provide any benefit to a company that has not already received a LeadiD associated with a lead from another source.

f. "As such, they are also part of the retargeting network. They are paying for TCPA compliance, while Jornaya profits from their data and site traffic. This is a terrible deal for the site owner. The more traffic coming to the site, the higher the odds one of the visitors will be triggered as a retargeted lead." As described above, Jornaya's product is not a retargeting network, and no consumers are "triggered as a retargeted lead." The only lead buyers who can access data are those who already have a LeadiD, which was voluntarily shared by the website that received the LeadiD from Jornaya.

g. "You are buying this lead with the understanding that there are a maximum number of possible buyers. However, there are actually more lenders that will be calling the lead." The only lead buyers who can access data are those who already have a LeadiD, and a Jornaya customer can call a consumer's phone number only if they have received the consumer's phone number from another source.

h. "The Customer Using the Retargeting Service. The customer using this service is essentially getting leads for free. They just have to pay for the use of the retargeting service. . . In addition, by [using Jornaya's scripts] they could be exposed to additional legal liability." There are no "customers using the retargeting service," because Jornaya does not offer a retargeting service.

Nobody can use Jornaya's product to "get leads for free." The only companies who can access Jornaya's LeadiD data are those who already have the LeadiD. Furthermore, there is nothing illegal about using Jornaya's scripts.

i. "The big question for sites with this script is where does this service go from here? Do they continue to expand it? What other products are being tested on your site visitors without your knowledge? Did you agree to help build a 'buyer journey' database?" Jornaya does not test any products on its customers' sites without their knowledge. All of its new products are launched with full disclosure and in complete compliance with its own publicly shared Terms of Use and Privacy Policies. Furthermore, as described above, Jornaya is not continuously tracking buyers as they browse from website to website.

## III. Continued Harm to Jornaya

35. ActiveProspect and Jornaya compete for clients on a regular basis, and are intimately knowledgeable about each other's products. For these reasons, Steve Rafferty knew or had reason to know that the Blog Post contains false and misleading statements.

36. At least two ActiveProspect employees—Ryan Pombrio and Marie Carroll—have since tweeted the Blog Post and continued its distribution through social media.

37. The Blog Post explicitly directs clients away from Jornaya and towards ActiveProspect's TrustedForm product.

38. Jornaya's customers have already approached Jornaya expressing concern and confusion. Among other statements, at least one customer has stated that it cannot do business with Jornaya if the Blog Post is accurate. Clients have emailed Jornaya and demonstrated that the Blog Post gave them (and their partners) the false impression that Jornaya is a retargeting

network, that Jornaya pushes lead information to unknown companies without a LeadiD, and that Jornaya continuously follows consumers from site to site to collect personal consumer information. Jornaya has been forced to clarify that it does not act, and has never acted, as a retargeting network.

39. Jornaya has historically been successful in competition for clients against ActiveProspect. Now, ActiveProspect's actions have damaged and irreparably injured Jornaya's goodwill, reputation, and future sales. If the Blog Post remains online, ActiveProspect will continue to damage and irreparably injure Jornaya.

**COUNT I: FALSE ADVERTISING UNDER THE LANHAM ACT (15 U.S.C. § 1125(a))**

40. Jornaya incorporates the above paragraphs by reference as if fully stated herein.

41. The Lanham Act prohibits any "false or misleading description of fact, or false or misleading misrepresentation of fact," which "in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities. 15 U.S.C. § 1125(a)(1).

42. By its conduct described above, ActiveProspect made literally false and misleading statements regarding Jornaya's LeadiD products.

43. The Blog Post has deceived a substantial portion of its intended audience, which is highly likely to view ActiveProspect's misrepresentations as complete and accurate statements of fact.

44. ActiveProspect's deception is material, and the Blog Post succeeds in its express purpose to influence purchasing decisions. ActiveProspect made its false and misleading statements within an advertisement for its own product, and that product was hyperlinked at various points throughout the Blog Post.

45. Jornaya's and ActiveProspect's service products are marketed, disseminated, and sold on the internet, and are used nationwide. LeadConduit, TrustedForm, Jornaya Intelligence, and Jornaya TCPA Guardian are online products, and customers interact with those products nationwide.

46. ActiveProspect's false and misleading statements were willful, intentional, and egregious.

47. ActiveProspect's actions have damaged and irreparably injured Jornaya, and if permitted to continue, will continue to damage and irreparably injure Jornaya. Unless ActiveProspect is immediately, preliminarily, and permanently enjoined from publishing or disseminating the misstatements in the Blog Post, Jornaya will be irreparably harmed by (a) loss of existing client relationships; (b) loss of potential future client relationships; (c) harm to its brand, (d) harm to its goodwill and reputation, (e) loss of profits associated with the foregoing; and (f) other forms of damage.

## COUNT II: FALSE ADVERTISING UNDER PENNSYLVANIA LAW

48. Jornaya incorporates the above paragraphs by reference as if fully stated herein.

49. By its conduct described above, ActiveProspect violated Pennsylvania's common law tort of unfair competition through false advertising.

50. As a result of ActiveProspect's conduct, Jornaya has been and will continue to be damaged.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Jornaya prays for relief as follows:

1. For orders preliminarily and permanently enjoining ActiveProspect and each of its employees, agents, officers, directors, attorneys, successors, affiliates, subsidiaries and assigns, and all those in active concert and participation with Defendants from:

a. Maintaining, publishing, disseminating, displaying, circulating, forwarding, or otherwise sharing the Blog Post (or any substantially similar statement or representation) by any means;

b. making or displaying any statement or representation that is likely to lead the public or customers to believe that Jornaya engages in retargeting, facilitates retargeting, collects personal consumer information, disseminates personal consumer information, or continuously tracks consumers;

c. engaging in any other activity constituting unfair competition with Jornaya; and

d. aiding, assisting, or abetting any other party in doing any act prohibited by the above sub-paragraphs (a) through (c).

2. For an order compelling ActiveProspect to issue a corrective notice on its website stating that the Blog Post contained false information about Jornaya and has been withdrawn and to pay Jornaya an amount sufficient for Jornaya to conduct an advertising campaign to correct the damage suffered to the reputation and goodwill of Jornaya as a result of Defendant's acts of false advertising and unfair competition.

3. For an order that ActiveProspect deliver up for destruction all promotional and sales materials and advertising materials, whether in print or digital form, and all plates, masters,

proofs and similar items from which such materials may be reproduced, containing Defendants' false and misleading statements, pursuant to 15 U.S.C. § 1118.

4. For an order directing that ActiveProspect file with the Court and serve upon Plaintiff's counsel within thirty (30) days after entry of such judgment, a report in writing under oath, setting forth in detail the manner and form in which Defendants have complied therewith.

5. For an award of such damages as Jornaya has sustained or will sustain by reason of ActiveProspect's unfair competition.

6. For an award of damages in an amount exceeding $150,000 for "(1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action" and treble damages pursuant to 15 U.S.C. § 1117, to whatever extent such damages may be determined.

7. For an award of exemplary and punitive damages to deter any future willful conduct as the Court finds appropriate.

8. For an award of Jornaya's costs and disbursements incurred in this action, including its reasonable attorneys' fees.

9. For an award of such other and further relief as the Court may deem equitable and proper.

**JURY TRIAL DEMAND**

Plaintiff demands a trial by jury on any and all claims for which trial by jury is available.

Respectfully submitted,

David Landau
Richard Heaslip
DUANE, MORRIS LLP
30 South 17th Street
Philadelphia, PA 19103
215-979-1230/1138

April 4, 2017

*Attorneys for Plaintiff*

# EXHIBIT A

Case 2:17-cv-01519-RBS Document 1 Filed 04/04/17 Page 16 of 22



MENU

Share on Facebook

Share on Twitter

Share on LinkedIn

**COMPLIANCE, TRUSTEDFORM**

# Jornaya Using Script as a Retargeting Network

by Steve Rafferty on March 28, 2017



Are you unknowingly exposing all of your web traffic to a third-party retargeting network? If you run the Jornaya (formerly known as LeadiD) script on your website, this is exactly what you are doing. In many cases, site owners are required by their lead buyers to place the script on their site to document TCPA compliance. However, this script also collects data and monitors visitor activity

that Jornaya resells in the form of data products like intent scores and, most recently, retargeting triggers. This has serious implications for your business, so you should be informed of what is going on.

Since ActiveProspect's TrustedForm product is a competitive TCPA compliance solution, our customers and prospects have asked if we will offer similar lead retargeting capabilities. The answer to that question is simple: No. We won't do it because the practice is harmful to any company that has this script on their site and introduces serious consumer privacy concerns. I'll dig in to both of these points, as they are important to our customers, consumers, and the industry as a whole.

## What is the retargeting service?

On November 17, 2016, Jornaya issued a press release officially announcing their Intelligence Plus Solution, which "delivers intelligence on a prospect's post-lead shopping behavior." In other words, they are using their script to track a consumer's activity online, after the consumer has submitted a web form requesting contact on any site where their script is present. A mortgage lending case study on the service further explains that: "After the lead submission, lenders began automatically re-auditing leads at regular intervals to see whether their consumers had exhibited continued shopping behavior within the Jornaya network.... when a lead is identified as back in their buying journey they would go back into the dialer." This means that if a consumer who requests to be contacted by a lender in January visits a different mortgage site in March, Jornaya will notify the initial lender that she's interested again, even though she didn't revisit their site. The initial lender will start calling her again, even though she didn't ask them to.

## Example:

A consumer goes to mortgage site A to get a mortgage refinance quote. The consumer submits the form and is subsequently called by "Lender X", who is using the retargeting service. The consumer decides not to move forward with

the refinancing and Lender X eventually stops calling. Then a couple of months later, the consumer goes to mortgage site B to get a mortgage quote. By visiting the site, the script on the site notifies Lender X that the consumer is shopping for a mortgage again. So Lender X starts calling the consumer again, even though they did not receive the lead from Site B. If the consumer submits the form at site B, they will be contacted by the Site B lenders, plus Lender X.

## Who Wins and Who Loses?

There are four parties involved in this transaction: 1) the consumer, 2) the site owners who have the script on their webpages, 3) the various lenders who bought the lead, and 4) the customer using the retargeting service. This practice is bad for all the parties involved, except the retargeting customer (and in some cases it is bad for them too). Let's look at this practice from each perspective:

1. **The Consumer**
   If you pay attention to the news, consumers aren't happy about the level of online tracking. So I doubt consumers would be happy to know that a company is building a massive consumer database that tracks each time they visit a website where this script is present. Jornaya calls this the "customer journey." Others might call it web stalking. Imagine that just visiting a website causes the consumer to get a phone call from an unrelated company. Is this being disclosed to the consumer? Given that the site owners weren't even aware of this, probably not. If I go to a mortgage site that tells me I'm going to get calls from four lenders, I'm not happy when I get calls from five or maybe more. How many companies might call me? Do they put a cap on the number of retargeting clients they will notify about my behavior online? Could I get a call from an additional three or four companies by visiting a site? Ten companies? How long do they track me? It is not clear, as it isn't disclosed anywhere. As a consumer, can I opt out from this practice? There are plenty of privacy questions that are simply not answered.
   ***Assessment:*** *Consumer loses*

2. **Site Owners Who Have Placed the Script on Their Site**
   The role of a lead gen company is to turn web traffic into leads. As such, the traffic coming to the website is arguably the company's most precious asset. With this service, Jornaya is monetizing the site visitors while providing no compensation to the site owner in return. If the site sells shared leads to four buyers, this is like having a fifth buyer that doesn't pay anything for the lead. There is no scenario where this is good for the site owner. There are some companies that voluntarily put the script on their site and pay to document and store consent for TCPA compliance. As such, they are also part of the retargeting network. They are paying for TCPA compliance, while Jornaya profits from their data and site traffic. This is a terrible deal for the site owner. The more traffic coming to the site, the higher the odds one of the visitors will be triggered as a retargeted lead.In addition to the lost revenue, there are also legal risks for the site owner, which is ironic since the primary point of installing the script is to reduce legal risks. For example, if the site owner's privacy policy does not disclose this practice, or claims it doesn't engage in it, this could be deemed misleading or deceptive. The site owner could be held responsible, even if it's not profiting from the practice.
   ***Assessment:*** *Site owners lose*

3. **The Other Companies That Bought the Lead**
   In the example above, if you were the lender that bought the lead from Site B, your conversion rate will decline. You are buying this lead with the understanding that there are a maximum number of possible buyers. However, there are actually more lenders that will be calling the lead. So any revenue that Lender X gets from this service is at your expense. In the long run, you will probably try to negotiate a lower price with the site owner to compensate for the lower conversion rate.
   ***Assessment:*** *Lenders lose*

4. **The Customer Using the Retargeting Service**
   The customer using this service is essentially getting leads for free. They just have to pay for the use of the retargeting service. As long as the value of the customers acquired from this service is greater than the cost paid for it, this is a good deal financially. I can see how this is an attractive offering to a lead buyer that is trying to figure out ways to acquire more customers. However, this is only a good deal for them as long as they don't use the script on their own website to document TCPA compliance. If they do, their site becomes part of the retargeting network and also fall into the site owner bucket above. In addition, by participating in this practice they could be exposed to additional legal liability.
   ***Assessment:*** *retargeting customer wins (as long as they don't place the script on their own site).*

In summary, this is a bad deal for almost everyone involved and even the customers who benefit have some real risk if they run the script on their own site (s). It is a zero sum game. The big question for sites with this script is where does this service go from here? Do they continue to expand it? What other products are being tested on your site visitors without your knowledge? Did you agree to help build a "buyer journey" database? If your goal is to document proof of consent or verify that you are buying authentic opt-in leads, TrustedForm is a far better alternative.

Because this is a harmful practice, we have not implemented this in TrustedForm and never will. We created TrustedForm to improve the value of Internet leads and to document proof of consent for legal compliance, not monetize your site traffic. Our mission has not changed since we launched the service in 2010 – TrustedForm is an independent and neutral third party to certify internet leads. We have always been explicit about what our script does and doesn't do (with legal terms to back it up). We are currently revising our TrustedForm End User License Agreement to make it abundantly clear that the TrustedForm script will not be used this way, to ensure our partners are protected from this practice.

**TAGGED:**
Compliance, Jornaya, Retargeting, TCPA, TrustedForm

# Sign up for our Monthly Newsletter!

**YOU'LL RECEIVE INFO ABOUT OUR PRODUCTS, MARKETING, AND PROMOTIONS**

Enter your email address

**PLATFORM**

Product Overview

LeadConduit

TrustedForm

SuppressionList

Pricing

LeadConduit API Docs

**SOLUTIONS**

CASL Compliance

TCPA Compliance

Duplicates & Pre-Ping

**ABOUT US**

Welcome

Blog & News

Contact Us

Careers

**EDUCATION**

Education

White Papers

**LEGAL**

Privacy Policy

Security

Terms

TrustedForm EULA

**TALK TO SALES**

**VERIFICATION OF COMPLAINT**

I, Ross Shanken, verify under penalty of perjury under the laws of the United States of America that I am authorized to make this Verification and that the statements made in the foregoing Verified Complaint are true and correct to the best of my knowledge.

Ross Shanken

Dated: April 4, 2017