UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

```
----------------------------------------------------
LEAD INTELLIGENCE, INC.                 :
d/b/a JORNAYA                           :
                                        :
                      Plaintiff,        :
          v.                            :
                                        :
                                        :
ACTIVEPROSPECT, INC.                    :
                                        :
                      Defendant.        :
----------------------------------------------------
```

**17   1519**

Civil Action Number: _____

JURY TRIAL DEMANDED

### PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Plaintiff Lead Intelligence, Inc. d/b/a Jornaya ("Plaintiff" or "Jornaya"), by and through

its undersigned counsel, Duane Morris LLP, hereby moves pursuant to Federal Rule of Civil

Procedure 65, for a temporary restraining order and preliminary injunction against Defendant

ActiveProspect, Inc. for its ongoing violation of the Lanham Act (15 U.S.C. § 1125) and its False

Advertising under Pennsylvania law.  In support, Plaintiff relies on its Memorandum of Law,

Verified Complaint, and exhibits thereto, all of which are incorporated by reference.

WHEREFORE, Plaintiff respectfully requests that this Court enter an order against

Defendants in the form attached.

Respectfully submitted,

David Landau
Richard Heaslip
DUANE, MORRIS LLP
30 South 17th Street
Philadelphia, PA 19103
215-979-1230/1138
*Attorneys for Plaintiff*

April 4, 2017

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

---

|  |  |
|---|---|
| LEAD INTELLIGENCE, INC. | : |
| d/b/a JORNAYA | : |
|        Plaintiff, | : |
|     v. | : |
|  | : |
|  | : |
| ACTIVEPROSPECT, INC. | : |
|  | : |
|        Defendant. | : |

Civil Action Number: _____   17   1519

JURY TRIAL DEMANDED

---

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION AND TEMPORARY RESTRAINING ORDER

David Landau
Richard Heaslip
DUANE MORRIS LLP
30 South 17th Street
Philadelphia, PA 19103-4196
Tel: 215-979-1230/1138

*Attorneys for Plaintiff*
*Lead Intelligence, Inc.*

## TABLE OF CONTENTS

I.  **INTRODUCTION** ..................................................................................................1

II. **RELEVANT FACTS** ...........................................................................................2

    A.  Jornaya's LeadiD System .................................................................. 2

    B.  ActiveProspect and Its Blog Post ...................................................... 4

    C.  Continued Harm to Jornaya .............................................................. 9

III. **ARGUMENT** ......................................................................................................10

    A.  Jornaya is Likely to Succeed on the Merits of its Lanham Act Claim. ............... 10

        1.  ActiveProspect's Statements Are Literally False. .....................................11

        2.  ActiveProspect's Misleading Statements Caused Actual Deception and Have a Tendency to Deceive their Intended Audience. ......................13

        3.  ActiveProspect's Deceptions Were Made in a Commercial Advertisement and Likely to Influence Customer Purchasing Decisions. ....................................................................................14

        4.  The Advertised Products Traveled in Interstate Commerce .....................15

        5.  There is a High Likelihood of Injury to Jornaya.........................................16

    B.  Jornaya is Likely to Succeed on the Merits of its False Advertising Claim under Pennsylvania Law. ................................................................... 16

    C.  Jornaya Will Suffer Irreparable Harm if the Injunction is Denied. ...................... 16

    D.  Granting the Relief Will Not Result in any Harm to ActiveProspect.................... 17

    E.  The Public Interest Favors the Relief Requested. ................................................ 18

IV. **CONCLUSION** .................................................................................................19

DM2\7680920.6

# TABLE OF AUTHORITIES

**Cases**

*Advanced Fluid Sys. v. Huber*, 28 F. Supp. 3d 306 (M.D. Pa. 2014) ...........................................14

*Am. Tel. & Tel. Co. v. Winback & Conserve Program, Inc.*, 42 F.3d 1421 (3d Cir. 1994) ....................................................................................................................................18

*Bimbo Bakeries USA, Inc. v. Botticella*, 613 F.3d 102 (3d Cir. 2010) ..........................................10

*Cannella v. Brennan*, No. 2:12-CV-1247, 2014 U.S. Dist. LEXIS 107944 (E.D. Pa. 2014) ...................................................................................................................................11, 15

*Castrol Inc. v. Pennzoil Co.*, 987 F.2d 939 (3d Cir. 1993) ............................................................11

*Groupe SEB United States, Inc. v. Euro-Pro Operating LLC*, 774 F.3d 192 (3d Cir. 2014) ....................................................................................................................................16

*Johnson & Johnson-Merck Pharms. Co. v. Rhone-Poulenc Rorer Pharms., Inc.*, 19 F.3d 125 (3d Cir. 1994) ....................................................................................................11, 13

*Kennedy Indus., Inc. v. Aparo*, 416 F. Supp. 2d 311 (E.D. Pa. 2005) ..........................................18

*National Business Services, Inc. v. Wright*, 2 F. Supp. 2d 701 (E.D. Pa. 1998) ...........................16

*Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharms. Co.*, 290 F.3d 578 (3d Cir. 2002) ............................................................................... 11-12, 18

*NTP Marble, Inc. v. AAA Hellenic Marble, Inc.*, No. 09-cv-05783, 2012 U.S. Dist. LEXIS 24671 (E.D. Pa. 2012) ..................................................................................................15

*Performance Indus. v. Koos, Inc.*, Civil Action No. 90-6435, 1990 U.S. Dist. LEXIS 14031 (E.D. Pa. 1990) ........................................................................................... 16-17

*Pharmacia Corp. v. GlaxoSmithKline Consumer Healthcare, L.P.*, 292 F. Supp. 2d 611 (D.N.J. 2003) .................................................................................................................17

*S&C Rest. Corp. v. Sofia's Diner Rest., Inc.*, 1999 U.S. Dist. LEXIS 12603 (E.D. Pa. 1999) ...................................................................................................................................16

*TrafficSchool.com, Inc. v. Edriver Inc.*, 653 F.3d 820 (9th Cir. 2011) ..........................................11

*United States v. MacEwan*, 445 F.3d 237 (3d Cir. 2006) ..............................................................15

**Statutes**

15 U.S.C. § 1125 .....................................................................................................................1, 10

DM2\7680920.6

**Other Authorities**

Fed. R. Civ. P. 65(a) ...................................................................................................................10

*Jornaya Terms of Use*, Jornaya (Nov. 4, 2016), http://www.jornaya.com/terms-of-
use ...........................................................................................................................................12

*Lead Sellers*, ActiveProspect (Aug. 14, 2014),
https://activeprospect.com/trustedform-masked-certificates-for-lead-sellers/...........................5

*Retargeting 101 – What is Retargeting?*, Perfect Audience,
https://www.perfectaudience.com/retargeting/ (accessed Apr. 3, 2017) ...................................4

*What Is Retargeting and How Does It Work?*, ReTargeter,
https://retargeter.com/what-is-retargeting-and-how-does-it-work (accessed
Apr. 3, 2017)..............................................................................................................................4

Steve Rafferty, *Jornaya Using Script as a Retargeting Network*, ActiveProspect
(Mar. 28, 2017), https://activeprospect.com/jornaya-using-script-as-
retargeting-network/....................................................................................................................1

Rob Pegoraro, *How Does Ad "Retargeting' Work?*, USA Today (Feb. 9, 2014)
https://www.usatoday.com/story/tech/columnist/2014/02/09/targeted-ads-
facebook/5230989/.....................................................................................................................4

## I.   INTRODUCTION

Plaintiff Lead Intelligence, Inc. d/b/a "Jornaya" ("Plaintiff" or "Jornaya") and Defendant ActiveProspect, Inc. ("Defendant" or "ActiveProspect") are competitors offering online products that—among other services—allow clients to remain compliant with the Telephone Consumer Protection Act, as well as certify consumer intent related to purchased leads.  Verif. Compl. ¶ 1. In an effort to gain a competitive advantage, on March 28, 2017, Steve Rafferty, the CEO and Founder of ActiveProspect, Inc., authored a blog post ("Blog Post") on ActiveProspect's website containing false and misleading information about Jornaya and its products.  *Id.* ¶ 2; Steve Rafferty, *Jornaya Using Script as a Retargeting Network*, ActiveProspect, (Mar. 28, 2017), https://activeprospect.com/jornaya-using-script-as-retargeting-network/, attached as Exhibit A.

Rafferty falsely characterizes Jornaya's services as a "retargeting network"—a network of websites that uses scripts to track an Internet user's browsing history from website to website, report upon that user's browsing and serve advertisements to that browser to redirect the user back to a prior website.  Verif. Compl. ¶ 3.  Jornaya does not engage in retargeting.  *Id.*  Indeed, its Terms of Use disclaim such activity.  Rafferty also falsely suggests that Jornaya sells personal information about consumers to "unrelated companies."  Jornaya does not collect or sell personal information about consumers.  *Id.* ¶ 4.

ActiveProspect's statements are in violation of the Lanham Act, 15 U.S.C. § 1125, causing irreparable harm to Jornaya. After reading the Blog Post, Jornaya's customers are complaining about the alleged improper activity and seeking explanations and redress.  The Court, therefore, should issue a temporary restraining order mandating that the offending Blog Post be taken down, and upon an opportunity to be heard, should preliminarily enjoin ActiveProspect from inflicting irreparable harm on Jornaya.

1

## II.    RELEVANT FACTS

### A.    Jornaya's LeadiD System

Jornaya is a technology company that provides non-personal information about customer leads that a marketer has purchased or generated. It utilizes commonly used computer code called JavaScript and patented processes. Verif. Compl. ¶ 12. Websites that generate leads may use Jornaya code on their sites to accomplish two things: (1) issue a unique identifier ("LeadiD") for a consumer's particular website visit, much like a vehicle identification number ("VIN") for a car; and (2) collect anonymous (non-personal) information about that particular website visit, much like Google Analytics or a similar service. Jornaya stores the anonymous information and LeadiDs for the purpose of responding to a future query about a LeadiD, much like a vehicle history query for a car's VIN. Verif. Compl. ¶ 13.

In the auto industry, a VIN is applied to the car during the manufacturing process to stamp and authenticate the automobile's true origins, e.g., the Ford assembly plant in Trent, MI. The VIN then serves as a trusted identifier for the car during the purchase and sale journey as the car moves from dealership to private owner and potentially future owners. A subsequent car buyer can use the VIN number to submit an inquiry to a car records service and order an individualized car report (e.g., a Carfax report) to ensure that the car is what the seller represents it to be. A VIN inquiry can reveal how old the car is, how many owners it has had, and how many times the car was in an accident or serviced.

The LeadiD system works in a similar way. Jornaya allows websites that generate and sell leads to include the LeadiD with the leads they sell to other parties. *Id.* ¶ 14. This enables lead buyers to query Jornaya with the LeadiDs they already possess to verify each lead's authenticity and history. *Id.* The lead buyer can then certify that the leads are what the seller represented them to be, ensure compliance with the established regulatory marketing standards,

2

and better interact with consumers for optimal outcomes. *Id.* Jornaya's "Intelligence" product helps to facilitate that process. When the Intelligence product is queried with a valid LeadiD, it responds with data points such as how recently the lead was completed and how engaged the consumer was on the website visited (like Google Analytics). *Id.* ¶ 15.

The information that Jornaya possesses is not an open database; instead, data about a particular lead is only accessible upon the request of a party that has a LeadiD associated with the lead. *Id.* ¶ 16. Importantly, a LeadiD corresponds to a site visit, and not a site visitor. If a consumer visits a site on three consecutive days, those visits will generate three distinct LeadiDs, even if it is the same consumer. If that consumer then visits another website using Jornaya's services, that visit will generate a *fourth* LeadiD. Jornaya links its lead data to site visits, not individual identified consumers. *Id.* ¶ 17.

Jornaya's Terms of Use and Privacy Policies, publicly available on its website, are very clear in explaining the restrictions it places on the collection, use, and access to data it witnesses when its computer code runs on a website during the generation of a lead. *Id.* ¶ 18. The only way to access data from Jornaya is if its client has agreed to its Terms of Use and already has a LeadiD. Then, and only then, can a company access information about a specific event. This data is always requested from Jornaya by a client—Jornaya does not proactively send data to anyone absent an inquiry with a valid LeadiD. *Id.* ¶ 19. Jornaya does not collect consumer personal information. Any consumer personal information is automatically encrypted as it enters Jornaya's system using a one-way hash function which cannot be reversed, resulting in anonymized values only. Jornaya cannot sell a consumer's phone number or email address, because Jornaya does not collect consumer contact information. *Id.* ¶ 20.

3

In the world of online advertising, some companies use anonymous consumer identifiers to "retarget" advertising to consumer browsers or proactively share consumer information. *Id.* ¶ 21. As commonly known in the online advertising industry, retargeting networks use scripts to continuously track an Internet user's browsing history from website to website, proactively report upon that user's browsing and serve advertisements on subsequent websites to attempt to redirect the user back to a prior website. *Id.*[1] Jornaya does not do this. It is not in the online advertising business and does not sell products to consumers. It collects no personal consumer data, does not follow consumers continuously as they journey across multiple websites, and accordingly is not in the business of selling or continuously tracking personal consumer information. Verif. Compl. ¶ 22. Furthermore, a retargeting network must push data to advertising networks or other databases for targeting purposes. This would be impossible in the LeadiD system because Jornaya's data is only accessible via a query from a party that already has the lead information and a valid LeadiD. *Id.* ¶ 23.

## B.    ActiveProspect and Its Blog Post

ActiveProspect is a software company that offers two core services: LeadConduit, a sales lead management platform, and TrustedForm. TrustedForm directly competes with two of Jornaya's services: Jornaya Intelligence and Jornaya TCPA Guardian. *Id.* ¶ 24. Like Jornaya's

---

[1]    *See also What Is Retargeting and How Does It Work?*, ReTargeter, https://retargeter.com/what-is-retargeting-and-how-does-it-work (accessed Apr. 3, 2017) ("Retargeting is a cookie-based technology that uses simple a Javascript code to anonymously 'follow' your audience all over the Web. . . . Later, when your cookied visitors browse the Web, the cookie will let your retargeting provider know when to serve ads, ensuring that your ads are served to only to people who have previously visited your site."); Rob Pegoraro, *How Does Ad "Retargeting' Work?*, USA Today (Feb. 9, 2014) https://www.usatoday.com/story/tech/columnist/2014/02/09/targeted-ads-facebook/5230989/ (retargeting uses cookies to "[show] you an ad on one site for something you'd viewed or searched for at another site"); *Retargeting 101 – What is Retargeting?*, Perfect Audience, https://www.perfectaudience.com/retargeting/ (accessed Apr. 3, 2017) (describing the same process).

products, TrustedForm product is a JavaScript-based service that offers independent third party

lead certification services to verify the origin and authenticity of Internet leads. *Id.* ¶ 25. As its

website states, TrustedForm "independently verifies the origin and authenticity of Internet leads

by capturing information including the timestamp, IP address, browser, source URL, and a real-

time screenshot of the web form as seen by the site visitor." Jay Pinkert, *Introducing*

*TrustedForm Masked Certificates for Lead Sellers*, ActiveProspect (Aug. 14, 2014),

https://activeprospect.com/trustedform-masked-certificates-for-lead-sellers/.

Like Jornaya, TrustedForm witnesses the moment of lead capture and provides a

Certificate ID, similar to Jornaya issuing a LeadiD. Verif. Compl. ¶ 26. Like Jornaya,

TrustedForm provides contextual data about the lead. *Id.* ¶ 27. Like Jornaya, TrustedForm

offers to verify that a firm is receiving authentic leads, as well as verify and document consent

for regulatory compliance. *Id.* ¶ 28. The parties' competing products launched at similar times,

target the same industries and firms, and use similar language and promotion in the marketplace.

*Id.* ¶ 29.

On March 28, 2017, Steve Rafferty, the CEO and Founder of ActiveProspect, authored

an advertising blog post ("Blog Post") on ActiveProspect's public website containing false and

misleading information about Jornaya and its products. *See* Ex. A; Verif. Compl. ¶ 30. The blog

accuses Jornaya of engaging in retargeting, a practice shunned by Jornaya's and Active

Prospect's website publisher customers, in an attempt to lure Jornaya's customers to

ActiveProspect. *Id.* ¶ 31. It further portrays Jornaya as an unethical company, operating to the

detriment of the economic interests of its customers. *Id.*

The harmful misrepresentations in the Blog Post begin in the title: "Jornaya Using Script

as a Retargeting Network." Ex. A at 1. A retargeting network is an advertising network that

5

tracks consumers and serves subsequent advertisements to redirect consumers back to the web pages that they had previously visited. *See supra* n.1. The Blog Post consistently misrepresents that Jornaya is a retargeting network which collects and resells individual consumer data. Verif. Compl. ¶¶ 32-34. For example, the Blog Post states that:

1. Jornaya "collects data and monitors visitor activity that Jornaya resells in the form of data products like . . . retargeting triggers. This has serious implications for your business, so you should be informed of what is going on." Ex. A at 1-2. Jornaya does not retarget consumers, facilitate retargeting, continuously track consumers' personal web browsing, keep or distribute consumer personal data, keep or distribute consumer phone numbers, or share data with anyone who does not already possess the LeadiD. There is no other way to get data from Jornaya. Verif. Compl. ¶ 34(a).

2. "[I]f a consumer who requests to be contacted by a lender in January visits a different mortgage site in March, Jornaya will notify the initial lender that she's interested again, even though she didn't revisit their site. The initial lender will start calling her again, even though she didn't ask them to." Ex. A at 2. Jornaya does not continuously track consumers' personal web browsing, does not keep or distribute consumer personal data, does not keep or distribute consumer phone numbers, and does not send notifications or data to its customers absent a query. Verif. Compl. ¶ 34(b).

3. "By visiting the site, the script on the site notifies Lender X that the consumer is shopping for a mortgage again. So Lender X starts calling the consumer again, even though they did not receive the lead from Site B. If the consumer submits the

6

form at site B, they will be contacted by the Site B lenders, plus Lender X." Ex. A at 3. Jornaya does not notify prior companies of any subsequent lead activity absent a query with a valid LeadiD, and does not collect or distribute consumer personal information. Verif. Compl. ¶ 34(c).

4. "How many companies might call me? Do they put a cap on the number of retargeting clients they will notify about my behavior online? Could I get a call from an additional three or four companies by visiting a site? Ten companies? How long do they track me? It is not clear, as it isn't disclosed anywhere. As a consumer, can I opt out from this practice? There are plenty of privacy questions that are simply not answered." Ex. A at 3. Jornaya does not continuously track consumers' personal web browsing, does not keep or distribute consumer personal data, does not share any leads with any company that does not already have the lead from another source, and does not keep or distribute consumer phone numbers. Verif. Compl. ¶ 34(d).

5. "Jornaya is monetizing the site visitors while providing no compensation to the site owner in return. If the site sells shared leads to four buyers, this is like having a fifth buyer that doesn't pay anything for the lead. There is no scenario where this is good for the site owner." Ex. A at 4. Jornaya's product does not "monetize" a site's visitors at the expense of a site owner, and Jornaya does not act as an extra lead buyer. Further, there is no way for a "fifth buyer" to gain access to lead information from Jornaya because Jornaya does not provide leads to its customers. Jornaya's services do not provide any benefit to a customer who

7

has not already received a LeadiD associated with a lead from another source. Verif. Compl. ¶ 34(e).

6. "As such, they are also part of the retargeting network. They are paying for TCPA compliance, while Jornaya profits from their data and site traffic. This is a terrible deal for the site owner. The more traffic coming to the site, the higher the odds one of the visitors will be triggered as a retargeted lead." Ex. A at 4. As described above, Jornaya's product is not a retargeting network, and no consumers are "triggered as a retargeted lead." The only lead buyers who can access data are those who already have a LeadiD, which was voluntarily shared by the website that received the LeadiD from Jornaya. Verif. Compl. ¶ 34(f).

7. "You are buying this lead with the understanding that there are a maximum number of possible buyers. However, there are actually more lenders that will be calling the lead." Ex. A at 4. The only lead buyers who can access data are those who already have a LeadiD, and a Jornaya customer can call a consumer's phone number only if they have received the consumer's phone number from another source. Verif. Compl. ¶ 34(g).

8. "The Customer Using the Retargeting Service. The customer using this service is essentially getting leads for free. They just have to pay for the use of the retargeting service. . . In addition, by [using Jornaya's scripts] they could be exposed to additional legal liability." Ex. A at 5. There are no "customers using the retargeting service," because Jornaya does not offer a retargeting service. Nobody can use Jornaya's products to "get leads for free." The only lead buyers who can access Jornaya's LeadiD data are those who have already received the

8

LeadiD.  Furthermore, there is nothing illegal about using Jornaya's scripts.
Verif. Compl. ¶ 34(h).

9.  "The big question for sites with this script is where does this service go from
here? Do they continue to expand it? What other products are being tested on your
site visitors without your knowledge? Did you agree to help build a 'buyer
journey' database?" Ex. A at 5.  Jornaya does not test any products on its
customers' sites without their knowledge.  All of its new products are launched
with full disclosure and in complete compliance with its own publicly shared
Terms of Use and Privacy Policies.  Furthermore, as described above, Jornaya is
not continuously tracking buyers as they browse from website to website.  Verif.
Compl. ¶ 34(i).

### C.   Continued Harm to Jornaya

ActiveProspect and Jornaya compete for clients on a regular basis, and are intimately
knowledgeable about each other's products.  For these reasons, Steve Rafferty knew or had
reason to know that the Blog Post contains false and misleading statements.  *Id.* at ¶ 35.  At least
two ActiveProspect employees—Ryan Pombrio and Marie Carroll— have since tweeted the
Blog Post and continued its distribution through social media.  *Id.* at ¶ 36.  The Blog Post
explicitly directs clients away from Jornaya and towards ActiveProspect's TrustedForm product.
*See* Ex. A at 5 ("If your goal is to document proof of consent or verify that you are buying
authentic opt-in leads, TrustedForm is a far better alternative. Because this is a harmful practice,
we have not implemented this in TrustedForm and never will.").

By its conduct described above, ActiveProspect made false and misleading statements
regarding Jornaya's products.  A substantial portion of the Blog Post's intended audience is
highly likely to view ActiveProspect's misrepresentations as complete and accurate statements of

9

fact—in fact, Jornaya's customers have already approached Jornaya expressing concern and confusion. Verif. Compl. ¶ 38; *see also* Declaration of Ross Shanken, attached as Exhibit B.

ActiveProspect's deception is likely to influence purchasing decisions, as it was made within an advertisement for its own product. As a result, ActiveProspect's actions have damaged and irreparably injured Jornaya's goodwill, reputation, and future sales. If the Blog Post remains online, ActiveProspect will continue to damage and irreparably injure Jornaya.

On March 29, 2017, Jornaya sent a cease and desist to Rafferty demanding the Blog Post be taken down. In subsequent communications, Rafferty has not agreed to remove the Blog Post. Accordingly, the harm to Jornaya continues.

## III.   ARGUMENT

A movant is entitled to temporary and preliminary injunctive relief under Federal Rule of Civil Procedure 65(a) when it demonstrates:

> (1) a likelihood of success on the merits; (2) [the movant] will suffer irreparable harm if the injunction is denied; (3) granting relief will not result in even greater harm to the nonmoving party; and (4) the public interest favors such relief.

*Bimbo Bakeries USA, Inc. v. Botticella*, 613 F.3d 102, 109 (3d Cir. 2010) (internal quotation omitted). Here, all four factors weigh in favor of an immediate temporary restraining order and a preliminary injunction preventing ActiveProspect from publishing and perpetuating false and misleading information about Jornaya

### A.   Jornaya is Likely to Succeed on the Merits of its Lanham Act Claim.

Section 43(a) of the Lanham Act, 15 U.S.C. § 1125, prohibits any "false or misleading description of fact, or false or misleading misrepresentation of fact," which "in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities." 15 U.S.C. § 1125(a).

10

To prevail on its claim, Jornaya must demonstrate that: (1) ActiveProspect made a false or misleading statement regarding a product; (2) there is either actual deception or a tendency to deceive a substantial portion of the intended audience; (3) the deception is material in that it is likely to influence purchasing decisions; (4) the advertised goods (or misleading statement) entered interstate commerce and (5) there is a likelihood of injury to Jornaya. *Johnson & Johnson-Merck Pharms. Co. v. Rhone-Poulenc Rorer Pharms., Inc.*, 19 F.3d 125, 129 (3d Cir. 1994); *TrafficSchool.com, Inc. v. Edriver Inc.*, 653 F.3d 820, 828, n.3 (9th Cir. 2011); *Cannella v. Brennan*, No. 2:12-CV-1247, 2014 U.S. Dist. LEXIS 107944, at *18 (E.D. Pa. 2014). "If a plaintiff proves a challenged claim is literally false, a court may grant relief without considering whether the buying public was misled." *Id.* As a result, Third Circuit courts simplify the first factors such that "[l]iability arises if the commercial message or statement is either (1) literally false or (2) literally true or ambiguous, but has the tendency to deceive consumers." *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharms. Co.*, 290 F.3d 578, 586 (3d Cir. 2002), *see also Castrol Inc. v. Pennzoil Co.*, 987 F.2d 939, 943 (3d Cir. 1993).

Jornaya is exceedingly likely to demonstrate each of these requirements and is therefore likely to succeed on the merits of its Lanham Act claim.

### 1.    ActiveProspect's Statements Are Literally False.

To ultimately succeed upon the merits of its Lanham Act claim, Jornaya must prove either that ActiveProspect's statements were literally false or that they were deceptive. *Id.* "In analyzing whether an advertisement or product name is literally false, a court must determine, first, the unambiguous claims made by the advertisement or product name, and second, whether those claims are false." *See Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharms. Co.*, 290 F.3d 578, 586 (3d Cir. 2002). A literally false message may be explicit, but it may also be "conveyed by necessary implication when, considering the

11

advertisement in its entirety, the audience would recognize the claim as readily as if it had been explicitly stated." *Id.* (quoting *Clorox Co. v. Proctor & Gamble Commercial Co.*, 228 F.3d 24, 34 (1st Cir. 2000).

Here, as described at length above, ActiveProspect falsely characterized Jornaya's services as "a retargeting network." *See generally* Ex. A. Jornaya is not a retargeting network as that term is commonly defined in the Internet marketing industry. *See supra* n.1. Jornaya's scripts do not track a website visitor's browsing from website to website and report back information about each website the visitor visited after a first website that implements Jornaya's scripts. Verif. Compl. ¶ 32. Moreover, Jornaya's scripts do not enable a first website to cause advertisements to be served to a visitor at subsequently visited websites. *Id.* Jornaya does not market its services as retargeting services and indeed expressly states in its Terms of Use that it does not engage in retargeting consumers. *Id.*; *Jornaya Terms of Use*, http://www.jornaya.com/terms-of-use, Jornaya (Nov. 4, 2016) ("In no way does Jornaya retarget consumers or sell consumer data of any kind.").

Beyond the false characterization of Jornaya as a retargeting network, ActiveProspect falsely states that Jornaya is actively "pushing" or publishing information to unknown retargeting service customers that are "essentially getting leads for free." Ex. A at 5. Jornaya does not automatically notify customers or third parties of subsequent lead activity absent a query with a valid LeadiD. The only parties that can review information about a lead are the parties that (1) already generated or purchased the lead, and (2) have a LeadiD associated with the lead to request information from Jornaya. Verif. Compl. ¶ 34(h). Nobody is "getting leads for free."

ActiveProspect falsely states that "Jornaya is monetizing [a] site['s] visitors while providing no compensation to the site owner in return." Ex. A. Again, Jornaya does not collect

or store personal information about consumers and does not sell personal information about consumers. The only information Jornaya provides when queried with a LeadiD is information that was provided to the party by the website that generated the lead. This information does not include personal information. Verif. Compl. ¶¶ 33, 34(e).

ActiveProspect misleadingly suggests that Jornaya is "building a massive consumer database" by "web-stalking" consumers, and suggests that Jornaya sells personal information about consumers to "unrelated companies." Ex. A at 3. This suggestion is literally false by necessary implication. Even if these statements are vague due to creative word choices (such as a nebulous definition of "web-stalking"), they presuppose incorrect facts (such as the collection of personal information and monitoring consumer behavior across their entire web journey). Jornaya does not collect or store personal information about consumers, does not monitor consumers across their entire "web journey," and does not sell or otherwise provide personal consumer information. Verif. Compl. ¶ 33.

### 2.    ActiveProspect's Misleading Statements Caused Actual Deception and Have a Tendency to Deceive their Intended Audience.

Even if the above false statements were not literally false or false by necessary implication, Jornaya remains likely to demonstrate that customers reviewing these messages were misled. "If a plaintiff does not prove the claim to be literally false, he must prove that it is deceptive or misleading, which depends on the message that is conveyed to consumers." *Johnson & Johnson-Merck Consumer Pharm. Co. v. Rhone-Poulenc Rorer Pharm., Inc.*, 19 F.3d 125, 129 (3d Cir. 1994) (citing *U.S. Healthcare, Inc. v. Blue Cross of Greater Phila.*, 898 F.2d 914, 922 (3d Cir. 1990), *cert. denied*, 498 U.S. 816, 111 S.Ct. 58, 112 L.Ed.2d 33 (1990)). ActiveProspect's false and misleading statements will influence any customer or potential customer who reads them. ActiveProspect is currently promoting and disseminating its Blog

13

Post, which expressly aims to divert customers from Jornaya to ActiveProspect. *See* Verif.
Compl. ¶ 35 (noting that the Blog Post was tweeted by multiple ActiveProspect employees).
After only a few days, the Blog Post is already within the top twenty Google search results for
"Jornaya."

Furthermore, in the mere days since the Blog Post was published, Jornaya's customers
and potential customers have already provided evidence of actual confusion resulting from the
Blog Post. *See generally* Ex. B. Jornaya has been forced to clarify that it does not act, and has
never acted, as a retargeting network. Clients have emailed Jornaya and demonstrated that the
Blog Post gave them (and their partners) the false impression that Jornaya is a retargeting
network, that Jornaya pushes lead information to unknown companies without a LeadiD, and that
Jornaya continuously follows consumers from site to site to collect personal consumer
information. *See id.*; Verif. Compl. ¶ 38. Such false impressions are actionable under the
Lanham Act. *See Advanced Fluid Sys. v. Huber*, 28 F. Supp. 3d 306, 334 (M.D. Pa. 2014)
(noting that liability can arise where a defendant has created a "false impression" (citing *Ames
Pub. Co. v. Walker-Davis Pubs., Inc.*, 372 F. Supp. 1, 11 (E.D. Pa. 1974)). For these reasons,
Jornaya is likely to demonstrate that ActiveProspect's false and misleading statements caused
actual deception.

### 3. ActiveProspect's Deceptions Were Made in a Commercial Advertisement and Likely to Influence Customer Purchasing Decisions.

Jornaya's customers have already expressed significant concerns and confusion regarding
the Blog Post, and have noted that they cannot do business with Jornaya if the statements in the
Blog Post are true. *See* Ex. B. Furthermore, the Blog Post is a clear example of commercial
advertising. "[A] message is commercial advertising if it is commercial speech disseminated to
the purchasing public made by a party in commercial competition with another to influence

14

customers to buy one party's goods or services over the others." *NTP Marble, Inc. v. AAA Hellenic Marble, Inc.*, No. 09-cv-05783, 2012 U.S. Dist. LEXIS 24671, at \*6 (E.D. Pa. 2012) (citing *ZS Associates, Inc. v. Synygy, Inc.*, No. 10-CV-4274, 2011 U.S. Dist. LEXIS 55711, 2011 WL 2038513, at \*7 (E.D. Pa. 2011)). The Blog Post was intended as an advertisement for ActiveProspect's products, and it explicitly directs clients away from Jornaya and towards ActiveProspect's TrustedForm product. *See* Ex. A at 5 ("If your goal is to document proof of consent or verify that you are buying authentic opt-in leads, TrustedForm is a far better alternative. Because this is a harmful practice, we have not implemented this in TrustedForm and never will."). For these reasons, ActiveProspect's misrepresentations were material, made in a commercial advertisement, and likely to influence customer behavior.

### 4.    The Advertised Products Traveled in Interstate Commerce

The advertised products traveled in interstate commerce because ActiveProspect and Jornaya sell competing products and services on the internet. *See, e.g.*, *United States v. MacEwan*, 445 F.3d 237, 245 (3d Cir. 2006) (finding that "the Internet is an instrumentality and channel of interstate commerce"); *Cannella v. Brennan*, 2014 U.S. Dist. LEXIS 107944, at \*20 (E.D. Pa. 2014) ("When the allegedly false or misleading statement is accessible through the internet and might have an impact on parties outside the state, the interstate commerce requirement has been satisfied."). LeadConduit, TrustedForm, Jornaya Intelligence, and Jornaya TCPA Guardian are online products, and customers interact with those products nationwide. Because both companies solicit and serve customers on the internet nationwide, the advertised products (and ActiveProspect's false and misleading statements) traveled in interstate commerce.

15

**5.     There is a High Likelihood of Injury to Jornaya.**

Jornaya is likely to demonstrate that it has been—and continues to be—injured by

ActiveProspect's false and misleading statements.  Here, Jornaya and ActiveProspect are direct

competitors, and ActiveProspect's misstatements are made in the context of a direct comparison

between Jornaya's and ActiveProspect's products.  As a result, Jornaya has already encountered

evidence of customer confusion, and Jornaya is continuing to suffer harm to its brand, harm to its

goodwill and reputation, lost sales, and other forms of damage.  *See generally* Ex. B.

**B.     Jornaya is Likely to Succeed on the Merits of its False Advertising Claim under Pennsylvania Law.**

"[A] false advertising action under Pennsylvania common law is identical to claims under

the Lanham Act, except there is no interstate commerce element under Pennsylvania law."

*Groupe SEB United States, Inc. v. Euro-Pro Operating LLC*, 774 F.3d 192, 198 n.5 (3d Cir.

2014). *See also S&C Rest. Corp. v. Sofia's Diner Rest., Inc.*, 1999 U.S. Dist. LEXIS 12603, at

\*7 n.1 (E.D. Pa. 1999) ("Since the elements of a Lanham Act violation and Pennsylvania's

common law tort of unfair competition through false advertising are the same, except for the

interstate commerce requirement...."). For the reasons described *supra* in Part III(A), Jornaya is

likely to succeed on the merits of its false advertising claim under Pennsylvania common law.

**C.     Jornaya Will Suffer Irreparable Harm if the Injunction is Denied.**

Jornaya continues to suffer irreparable harm.  "Irreparable harm" is harm that "cannot be

adequately compensated in damages," such as when damages cannot be quantified.  *National*

*Business Services, Inc. v. Wright*, 2 F. Supp. 2d 701, 709 (E.D. Pa. 1998).  "In an action seeking

an injunction against false advertising, the moving party carries its burden of demonstrating

irreparable harm when it offers proof providing a reasonable basis for the belief that the moving

party is likely to be damaged as a result of the false advertising." *Performance Indus. v. Koos,*

16

*Inc.*, Civil Action No. 90-6435, 1990 U.S. Dist. LEXIS 14031, at *15 (E.D. Pa. 1990).

Furthermore, in false advertising cases involving comparative advertising, courts frequently hold that irreparable harm will be presumed. *See id.* at *1; *Pharmacia Corp. v. GlaxoSmithKline Consumer Healthcare, L.P.*, 292 F. Supp. 2d 611, 621 (D.N.J. 2003) ("Additionally, a number of courts have held in Lanham Act cases that 'where the challenged advertising makes a misleading comparison or reference to a competitor's product, irreparable harm is presumed.'"). Here, Jornaya and ActiveProspect are direct competitors, Jornaya has historically been successful in competition for clients against ActiveProspect, Jornaya has fielded inquiries from clients upset by the Blog Post, and ActiveProspect's misstatements are made in the context of an advertisement directly comparing Jornaya's and ActiveProspect's products. As long as the Blog Post is publically accessible and disseminated, Jornaya is suffering harm to its brand, its goodwill, and its reputation. For these reasons, even if this Court does not presume Jornaya to have suffered—and continue to suffer—irreparable harm absent injunctive relief, Jornaya has provided a reasonable basis for the belief that it is likely to be irreparably harmed as a result of ActiveProspect's false and misleading statements. Jornaya will be irreparably harmed by (a) loss of existing client relationships; (b) loss of potential future client relationships; (c) harm to its brand, (d) harm to its goodwill and reputation, (e) loss of profits associated with the foregoing; and (f) other forms of damage.

### D.    Granting the Relief Will Not Result in any Harm to ActiveProspect.

The balance of harms weighs decidedly in favor of granting a temporary restraining order. Jornaya seeks an injunction to preserve the *status quo* by requiring ActiveProspect to remove a blog post containing false and misleading statements. ActiveProspect will suffer no discernable harm by deleting a single blog post, which is one of dozens of similar blog posts on ActiveProspect's web site. The primary purpose of the Blog Post is to perform a "hit job" on a

17

competitor's product and advertise ActiveProspect's product, but the advertising benefit is minute compared to the potential and current damage to Jornaya. Furthermore, Jornaya is requesting temporary relief at this stage—even if ActiveProspect is successful in defending against Jornaya's claims, ActiveProspect can hardly claim that it will be harmed by the delayed publishing of its Blog Post. For these reasons, the balance of harms leans disproportionately in Jornaya's favor.

> **E.** **The Public Interest Favors the Relief Requested.**

The public interest favors the issuance of an injunction against ActiveProspect's false advertisement. "There is a strong public interest in the prevention of misleading advertisements...." *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharms. Co.*, 290 F.3d 578, 583 (3d Cir. 2002); *see also Kennedy Indus., Inc. v. Aparo*, 416 F. Supp. 2d 311, 317 (E.D. Pa. 2005) ("There is a strong public interest in preventing false advertising of products in the marketplace."). "Moreover . . . where the plaintiff has demonstrated a likelihood of success on the merits, the public interest leans even more toward granting the injunction." *Novartis*, 290 F.3d at 583; *see also Am. Tel. & Tel. Co. v. Winback & Conserve Program, Inc.*, 42 F.3d 1421, 1427 (3d Cir. 1994) ("As a practical matter, if a plaintiff demonstrates both a likelihood of success on the merits and irreparable injury, it almost always will be the case that the public interest will favor the plaintiff."). Here, ActiveProspect is actively misleading the public in an attempt to influence its purchasing decisions with incorrect facts. The public interest weighs heavily in favor of Jornaya.

18

IV.   **CONCLUSION**

For the reasons stated, Jornaya respectfully requests that the Court grant its Motion for a

Temporary Restraining Order and Preliminary Injunction.

Respectfully submitted,

David Landau
Richard Heaslip
DUANE, MORRIS LLP
30 South 17th Street
Philadelphia, PA 19103
215-979-1230/1138

*Attorneys for Plaintiff*

April 4, 2017

19

# EXHIBIT A

ActiveProspect

MENU

Share on Facebook

Share on Twitter

Share on LinkedIn

**COMPLIANCE**, **TRUSTEDFORM**

# Jornaya Using Script as a Retargeting Network

by Steve Rafferty on March 28, 2017



Are you unknowingly exposing all of your web traffic to a third-party retargeting network? If you run the Jornaya (formerly known as LeadiD) script on your website, this is exactly what you are doing. In many cases, site owners are required by their lead buyers to place the script on their site to document TCPA compliance. However, this script also collects data and monitors visitor activity

that Jornaya resells in the form of data products like intent scores and, most recently, retargeting triggers. This has serious implications for your business, so you should be informed of what is going on.

Since ActiveProspect's TrustedForm product is a competitive TCPA compliance solution, our customers and prospects have asked if we will offer similar lead retargeting capabilities. The answer to that question is simple: No. We won't do it because the practice is harmful to any company that has this script on their site and introduces serious consumer privacy concerns. I'll dig in to both of these points, as they are important to our customers, consumers, and the industry as a whole.

## What is the retargeting service?

On November 17, 2016, Jornaya issued a press release officially announcing their Intelligence Plus Solution, which "delivers intelligence on a prospect's post-lead shopping behavior."  In other words, they are using their script to track a consumer's activity online, after the consumer has submitted a web form requesting contact on any site where their script is present. A mortgage lending case study on the service further explains that: "After the lead submission, lenders began automatically re-auditing leads at regular intervals to see whether their consumers had exhibited continued shopping behavior within the Jornaya network.... when a lead is identified as back in their buying journey they would go back into the dialer." This means that if a consumer who requests to be contacted by a lender in January visits a different mortgage site in March, Jornaya will notify the initial lender that she's interested again, even though she didn't revisit their site. The initial lender will start calling her again, even though she didn't ask them to.

## Example:

A consumer goes to mortgage site A to get a mortgage refinance quote. The consumer submits the form and is subsequently called by "Lender X", who is using the retargeting service. The consumer decides not to move forward with

the refinancing and Lender X eventually stops calling. Then a couple of months later, the consumer goes to mortgage site B to get a mortgage quote. By visiting the site, the script on the site notifies Lender X that the consumer is shopping for a mortgage again. So Lender X starts calling the consumer again, even though they did not receive the lead from Site B. If the consumer submits the form at site B, they will be contacted by the Site B lenders, plus Lender X.

## Who Wins and Who Loses?

There are four parties involved in this transaction: 1) the consumer,  2) the site owners who have the script on their webpages, 3) the various lenders who bought the lead, and 4) the customer using the retargeting service. This practice is bad for all the parties involved, except the retargeting customer (and in some cases it is bad for them too).  Let's look at this practice from each perspective:

1. **The Consumer**

   If you pay attention to the news, consumers aren't happy about the level of online tracking. So I doubt consumers would be happy to know that a company is building a massive consumer database that tracks each time they visit a website where this script is present. Jornaya calls this the "customer journey." Others might call it web stalking. Imagine that just visiting a website causes the consumer to get a phone call from an unrelated company. Is this being disclosed to the consumer?  Given that the site owners weren't even aware of this, probably not. If I go to a mortgage site that tells me I'm going to get calls from four lenders, I'm not happy when I get calls from five or maybe more.  How many companies might call me? Do they put a cap on the number of retargeting clients they will notify about my behavior online?  Could I get a call from an additional three or four companies by visiting a site? Ten companies? How long do they track me? It is not clear, as it isn't disclosed anywhere. As a consumer, can I opt out from this practice? There are plenty of privacy questions that are simply not answered.

   **Assessment:** *Consumer loses*

2. **Site Owners Who Have Placed the Script on Their Site**

   The role of a lead gen company is to turn web traffic into leads. As such, the traffic coming to the website is arguably the company's most precious asset. With this service, Jornaya is monetizing the site visitors while providing no compensation to the site owner in return. If the site sells shared leads to four buyers, this is like having a fifth buyer that doesn't pay anything for the lead. There is no scenario where this is good for the site owner. There are some companies that voluntarily put the script on their site and pay to document and store consent for TCPA compliance. As such, they are also part of the retargeting network. They are paying for TCPA compliance, while Jornaya profits from their data and site traffic. This is a terrible deal for the site owner. The more traffic coming to the site, the higher the odds one of the visitors will be triggered as a retargeted lead.In addition to the lost revenue, there are also legal risks for the site owner, which is ironic since the primary point of installing the script is to reduce legal risks. For example, if the site owner's privacy policy does not disclose this practice, or claims it doesn't engage in it, this could be deemed misleading or deceptive. The site owner could be held responsible, even if it's not profiting from the practice.

   ***Assessment:*** *Site owners lose*

3. **The Other Companies That Bought the Lead**

   In the example above, if you were the lender that bought the lead from Site B, your conversion rate will decline. You are buying this lead with the understanding that there are a maximum number of possible buyers. However, there are actually more lenders that will be calling the lead. So any revenue that Lender X gets from this service is at your expense. In the long run, you will probably try to negotiate a lower price with the site owner to compensate for the lower conversion rate.

   ***Assessment:*** *Lenders lose*

4. **The Customer Using the Retargeting Service**

   The customer using this service is essentially getting leads for free. They just have to pay for the use of the retargeting service. As long as the value of the customers acquired from this service is greater than the cost paid for it, this is a good deal financially. I can see how this is an attractive offering to a lead buyer that is trying to figure out ways to acquire more customers. However, this is only a good deal for them as long as they don't use the script on their own website to document TCPA compliance. If they do, their site becomes part of the retargeting network and also fall into the site owner bucket above. In addition, by participating in this practice they could be exposed to additional legal liability.

   ***Assessment:*** *retargeting customer wins (as long as they don't place the script on their own site).*

In summary, this is a bad deal for almost everyone involved and even the customers who benefit have some real risk if they run the script on their own site (s). It is a zero sum game. The big question for sites with this script is where does this service go from here? Do they continue to expand it? What other products are being tested on your site visitors without your knowledge? Did you agree to help build a "buyer journey" database? If your goal is to document proof of consent or verify that you are buying authentic opt-in leads, TrustedForm is a far better alternative.

Because this is a harmful practice, we have not implemented this in TrustedForm and never will. We created TrustedForm to improve the value of Internet leads and to document proof of consent for legal compliance, not monetize your site traffic. Our mission has not changed since we launched the service in 2010 – TrustedForm is an independent and neutral third party to certify internet leads. We have always been explicit about what our script does and doesn't do (with legal terms to back it up). We are currently revising our TrustedForm End User License Agreement to make it abundantly clear that the TrustedForm script will not be used this way, to ensure our partners are protected from this practice.

**TAGGED:**
Compliance, Jornaya, Retargeting, TCPA, TrustedForm

# Sign up for our Monthly Newsletter!

### YOU'LL RECEIVE INFO ABOUT OUR PRODUCTS, MARKETING, AND PROMOTIONS

Enter your email address

| PLATFORM | ABOUT US | LEGAL |
|---|---|---|
| Product Overview | Welcome | Privacy Policy |
| LeadConduit | Blog & News | Security |
| TrustedForm | Contact Us | Terms |
| SuppressionList | Careers | TrustedForm EULA |
| Pricing | | |
| LeadConduit API Docs | **EDUCATION** | **TALK TO SALES** |
| | Education | |
| **SOLUTIONS** | White Papers | |
| CASL Compliance | | |
| TCPA Compliance | | |
| Duplicates & Pre-Ping | | |

# EXHIBIT B

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

```
-------------------------------------------------
LEAD INTELLIGENCE, INC.                :
d/b/a JORNAYA                          :
                                       :
                       Plaintiff,      :
            v.                         :
                                       :   Civil Action Number: _____
                                       :
ACTIVEPROSPECT, INC.                   :
                                       :   JURY TRIAL DEMANDED
                       Defendant.      :
-------------------------------------------------
```

## DECLARATION OF ROSS SHANKEN

I, Ross Shanken, being duly sworn, declare pursuant to 28 U.S.C. § 1746 that:

1.    I am an adult and am competent to testify.

2.    I am personally knowledgeable of the facts of the above-captioned matter, and I make this declaration based upon my personal knowledge.

3.    I am the Founder and CEO of Lead Intelligence Inc., d/b/a Jornaya ("Jornaya").

4.    The emails attached to this Declaration (Exhibits 1 and 2 hereto) are true and correct copies of Jornaya's correspondence with customers, and they are among Jornaya's business records for its maintenance of client relationships.

5.    The confidential customer names have been redacted.

6.    I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 4, 2017.

Ross Shanken
Founder and CEO of Lead Intelligence Inc., d/b/a Jornaya

DM2\7687304.1

# EXHIBIT 1

4/4/2017    LeadiD Mail - Request for Comment

 Eli Schwarz <eschwarz@jornaya.com>

## Request for Comment

                                   Thu, Mar 30, 2017 at
                                                           12:27 AM
To: Eli Schwarz <eschwarz@jornaya.com>
Cc: ███████████████████████ , Josh Willson
<jwillson@jornaya.com>, ████████████████

Do you have a public facing blog post or collateral that clarifies
how cookies are used by jornaya.  Unfortunately we need a link or
materials we can distribute to our concerned client base.

Thanks

On Mar 29, 2017, at 5:38 PM, Eli Schwarz
<eschwarz@jornaya.com> wrote:

> Hey ███ ,
>
> Thank you for sending this over; we also saw
> it. In short, the information provided and
> claims made in the blog are just not accurate;
> authored by a competitor that has clearly
> decided to use misinformation to stir up some
> buzz and attention for themselves. We are
> happy to set up time with you to further
> discuss and clarify. We are on top of this and
> working to clear up the spreading of false
> information.

4/4/2017                    LeadiD Mail - Request for Comment

We appreciate your continued support; please
let me know if you have any questions or
would like to set up a quick call to discuss any
specific points.

Best Regards,

**Eli Schwarz**



| | |
|---|---|
|  | **Eli Schwarz** |
| The Power of Intent™ | C: (267) 536-5957 |
| **Twitter | LinkedIn** | www.Jornaya.com |

On Wed, Mar 29, 2017 at 8:35 PM, ██████████
██████████████ wrote:

Eli,

Can you provide us with yours or Jornaya's
comments/response to the article:
https://activeprospect.com/jornaya-using-script-
as-retargeting-network/

We have some clients who are concerned.

Thanks,

██████

# EXHIBIT 2

## CERTIFICATE OF NOTICE

I, David Landau, do hereby certify that Plaintiff contacted Steve Rafferty, the CEO and

Founder of ActiveProspect, Inc., via email at steve@activeprospect.com and notified him on

April 3, 2017, at or around 4:30 p.m., of Plaintiff's intention to seek an order compelling

ActiveProspect to remove the Blog Post. I further certify that Plaintiff emailed Defendant a copy

of its Motion for Temporary Restraining Order and Preliminary Injunction, as well as the

corresponding Memorandum of Law, Verified Complaint, and Exhibits on April 4, 2017.

David Landau

Dated: April 4, 2017

## CERTIFICATE OF SERVICE

I, David Landau, do hereby certify that a true and correct copy of Plaintiff's Motion for

Temporary Restraining Order and Preliminary Injunction, with the supporting Memorandum of

Law, Verified Complaint, and Exhibits, was served upon the following both electronically via

email and via first class mail, postage pre-paid:

Steve Rafferty<br>
ACTIVEPROSPECT, INC.<br>
4203 Guadalupe St,<br>
Austin, TX 78751<br>
steve@activeprospect.com<br><br><br>

_____<br>
David Landau

Dated: April 4, 2017